Nos. 22-35789, 22-35790

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITIZENS FOR CLEAN ENERGY, ET AL.

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF INTERIOR, ET AL.

*Defendants,*

&

NATIONAL MINING ASSOCIATION

*Intervenor-Defendant-Appellant,*

&

STATE OF WYOMING, ET AL.

*Intervenor-Defendants-Appellants,*

Appeal from the United States District Court for the
District of Montana

No. CV 17-30-BMM (Hon. Brian Morris, Chief District Judge)

## APPELLANTS' JOINT OPENING BRIEF

AUSTIN KNUDSEN
 *Attorney General of Montana*
CHRISTIAN B. CORRIGAN
 *Solicitor General*

PETER M. TORSTENSEN, JR.
 *Assistant Solicitor General*
Montana Department of Justice
 215 North Sanders
 P.O. Box 201401
 Helena, MT 59620-1401
 (406) 444-2026
 peter.torstensen@mt.gov
 *Attorneys for Appellant*
 *State of Montana*

TRAVIS JORDAN
 *Senior Assistant Attorney General*
Wyoming Attorney General's Office
 2320 Capitol Avenue
 Cheyenne, WY 82002
 (307) 777-7895
 travis.jordan@wyo.gov
*Attorney for Appellant*
*State of Wyoming*

JAMES M. AUSLANDER
PETER J. SCHAUMBURG
Beveridge & Diamond, P.C.
 1900 N St., N.W., Suite 100
 Washington, DC 20036
 (202) 789-6009
 jauslander@bdlaw.com
 pschaumberg@bdlaw.com
*Attorneys for Appellant*
*National Mining Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant National Mining Association ("NMA") states that (a) NMA is a national trade association whose members produce most of America's coal, metals, and industrial and agricultural minerals; (b) NMA's membership also includes manufacturers of mining and mineral processing machinery and supplies, transporters, financial and engineering firms, and other businesses involved in the nation's mining industries; and (c) NMA has no parent corporations and no publicly held company owns any stock in NMA.

No corporate disclosure statement is required for Appellant States.

# TABLE OF CONTENTS

Introduction ........................................................................... 1

Statement of Jurisdiction ................................................. 4

Statement of the Issues Presented .................................. 5

Statement of the Case ....................................................... 6

I.    Overview of Federal Coal Leasing Regulations ............................... 6

II.   The Beginning and End of the Discretionary PEIS and Coal
      Leasing "Pause." .......................................................... 8

III.  District Court Orders Interior to Prepare a NEPA Analysis
      for the Zinke Order, and Interior Does So. ................................ 12

IV.   District Court Rejects Plaintiffs' Request for a PEIS,
      and Plaintiffs Challenge Interior's NEPA Analysis. ....................... 14

V.    Secretary Haaland Revokes the Zinke Order .............................. 15

VI.   District Court Grants Plaintiffs' Requested Relief:
      An Injunction and PEIS by Any Other Name. ............................. 15

Standard of Review ......................................................... 17

Summary of Argument ..................................................... 19

Argument .......................................................................... 27

I.    Plaintiffs Fail to Establish Subject Matter Jurisdiction. ................. 27

      A.    Plaintiffs' claims are moot. ..................................... 27

      B.    The Zinke Order was not a final agency action .................... 33

      C.    Plaintiffs failed to establish Article III standing. ............... 39

      D.    Plaintiffs' claims are unripe. .................................... 42

II.    Plaintiffs' Claims Are Nonjusticiable Because They
       Constitute an Impermissible Programmatic Challenge ............... 43

III.   Rescinding the Jewell Order Was Not a Major Federal
       Action that Triggered NEPA ......................................................... 47

IV.    Interior's NEPA Review Was Not Arbitrary and Capricious ........ 54

       A.    The scope of Interior's EA complied with NEPA ................. 54

             1.    Interior reasonably defined the purpose and need
                   for the EA. ................................................................. 56

             2.    Interior's baseline for the EA was reasonable ............ 59

             3.    The federal coal leasing program is not a connected,
                   cumulative, or similar action with the Zinke Order. .. 61

       B.    Interior took a "hard look" at impacts of rescinding the
             Jewell Order. ........................................................................ 66

       C.    Interior considered a reasonable range of alternatives
             for its proposed action. ....................................................... 68

V.     The Court's Remedy Enjoining Leasing Impermissibly
       Rewrote Rather than "Reinstated" the Jewell Order ................... 71

CONCLUSION ................................................................................................ 77

TABLE OF AUTHORITIES

FEDERAL COURT CASES

*Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967) .............................................................. 42

*Alabama-Coushatta Tribe of Texas v. United States*,
    757 F.3d 484 (5th Cir. 2014) .............................................. 46

*Alaska Survival v. Surface Transp. Bd.*,
    705 F.3d 1073 (9th Cir. 2013) ............................................ 55

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ............................................................ 18

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................ 33

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ...................................... 65, 67

*Cal. ex rel. Lockyer v. U.S. Dept. of Agriculture*,
    575 F.3d 999 (9th Cir. 2009) ................................. 43, 51, 52

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ............................................. 71

*Chem. Producers & Distribs. Ass'n v. Helliker*,
    463 F.3d 871 (9th Cir. 2006) ............................................. 29

*Chilkat Indian Village of Klukwan v. BLM*,
    399 F. Supp. 3d 888 (D. Alaska. 2019) ............................. 63

*Churchill Cnty. v. Norton*,
    276 F.3d 1060 (9th Cir. 2001) ............................................ 65

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................ 19

*City of Carmel-by-The-Sea v. Dep't of Transp.*,
123 F.3d 1142 (9th Cir. 1997) ............................................... 69

*Colo. River Indian Tribes v. Dep't of Interior*,
No. 14-cv-02504 JAK(SPx), 2015 WL 12661945 (C.D. Cal.
June 11, 2015) ........................................................................ 57

*Conservation Law Found. v. Pritzker*,
37 F. Supp. 3d 234 (D.D.C. 2014) ......................................... 42

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ......................................... 18, 64

*Deakins v. Monaghan*,
484 U.S. 193 (1988) ............................................................... 28

*DeFunis v. Odegaard*,
416 U.S. 312 (1974) ............................................................... 28

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ................................................. 35

*Earth Island Inst. v. U.S. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003) ......................................... 65, 66

*Env't Health Trust v. Fed. Commc'ns Comm'n*,
9 F.4th 893 (D.C. Cir. 2021) ................................................. 53

*Fanin v. U.S. Dep't of Veterans Affairs*,
572 F.3d 868 (11th Cir. 2009) ............................................... 46

*Forelaws on Bd. v. Johnson*,
743 F.2d 677 (9th Cir. 1984) ................................................. 69

iv

*Found. on Econ. Trends v. Lyng,*
    817 F.2d 882 (D.C. Cir. 1987) ........................................... 44

*Friends of Se.'s Future v. Morrison,*
    153 F.3d 1059 (9th Cir. 1998) .......................................... 55

*Friends of the Wild Swan v. Weber,*
    767 F.3d 936 (9th Cir. 2014) ........................................... 68

*Friends of Yosemite Valley v. Kempthorne,*
    520 F.3d 1024 (9th Cir. 2008) .......................................... 70

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) .......................................................... 39

*Golden v. Zwickler,*
    394 U.S. 103 (1969) .......................................................... 29

*Great Basin Mine Watch v. Hankins,*
    456 F.3d 955 (9th Cir. 2006) ........................................... 62

*Grunewald v. Jarvis,*
    776 F.3d 893 (D.C. Cir. 2015) ......................................... 44

*Headwaters, Inc. v. BLM,*
    893 F.2d 1012 (9th Cir. 1989) .......................................... 30

*HonoluluTraffic.com v. Fed. Transit Admin.,*
    742 F.3d 1222 (9th Cir. 2014) .......................................... 57

*Indigenous Env't Network v. Trump,*
    No. 18-36068, ECF No. 56 (9th Cir. June 6, 2019) ........... 30

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.,*
    88 F.3d 754 (9th Cir. 1996) ............................................. 66

*Kettle Range Conservation Grp. v. U.S. Forest Serv.,*
    148 F. Supp. 2d 1107 (E.D. Wash. 2001) ......................... 55

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
    387 F.3d 989 (9th Cir. 2004) .............................................................. 66

*Kleppe v. Sierra Club,*
    427 U.S. 390, 406 (1976) ............................................................. 53, 66

*Krueger v. Morton,*
    539 F.2d 235 (D.C. Cir. 1976) ........................................................... 36

*Lands Council v. Powell,*
    379 F.3d 738 (9th Cir. 2004) .............................................................. 64

*League of Conservation Voters v. Biden, a President Biden*
    *Executive Order* 843 Fed. App'x 937 (9th Cir. 2021) ......................... 30

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v.*
    *U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) ........................ 55, 57

*Life of the Land v. Brinegar,*
    485 F.2d 460 (9th Cir. 1973) .............................................................. 70

*Lowry v. Barnhart,*
    329 F.3d 1019 (9th Cir. 2003) ............................................................ 51

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................... 39, 57

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ...................................................................... 44, 45

*Managed Pharmacy Care v. Sebelius,*
    716 F.3d 1235 (9th Cir. 2013) ............................................................ 18

*Marsh v. Oregon Nat'l Res. Council,*
    490 U.S. 373 (1989) ........................................................................... 50

*Mayfield v. United States*,
599 F.3d 964 (9th Cir. 2010) ............................................................ 39

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......................................................................... 76

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*,
274 F. Supp. 3d 1074 (D. Mont. 2017) .................................. 58, 77, 78

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................ 18

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
177 F.3d 800 (9th Cir. 1999) ............................................................ 55

*Nat. Res. Def. Council, Inc. v. Hodel*,
624 F. Supp. 1045 (D. Nev. 1985) .................................................... 71

*Nat'l Mining Ass'n v. Zinke*,
877 F.3d 845 (9th Cir. 2017) ............................................................ 19

*Nat'l Parks & Conservation Ass'n v. BLM*,
606 F.3d 1058 (9th Cir. 2010) .......................................................... 54

*Native Ecosystems Council v. Marten*,
800 F. App'x 543 (9th Cir. 2020) ...................................................... 46

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .......................................................... 69

*Native Vill. of Nuiqsut v. BLM*,
9 F.4th 1201 (9th Cir. 2021) ............................................................ 30

*Northcoast Env't Ctr. v. Glickman*,
136 F.3d 660 (9th Cir. 1998) .................................... 38, 47, 52, 53, 54

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ............................................................................ 46

vii

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,*
    56 F.3d 1060 (9th Cir. 1995) ........................................................ 62, 64

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) ................................................................... 41, 42

*ONRC Action v. BLM*, 150 F.3d 1132 (9th Cir. 1998) ..................... 35, 38

*Oregon Nat'l Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ............................................................ 34

*Oregon Nat'l Desert Ass'n v. Jewell,*
    840 F.3d 562 (9th Cir. 2016) ...................................................... 59, 71

*Plata v. Davis,*
    329 F.3d 1101 (9th Cir. 2003) .......................................................... 76

*Preiser v. Newkirk,*
    422 U.S. 395 (1975) ........................................................................ 28

*Presidio Golf Club v. Nat'l Park Serv.,*
    155 F.3d 1153 (9th Cir. 1998) .......................................................... 68

*Pub. Utilities Comm'n of State of Cal. v. FERC,*
    100 F.3d 1451 (9th Cir. 1996) .......................................................... 29

*Res. Ltd., Inc. v. Robertson,*
    35 F.3d 1300 (9th Cir. 1994) ...................................................... 41, 64

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ........................................................................ 47

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ........................................................................ 42

*Selkirk Conservation All. v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) ...................................................... 67, 68

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................ 41

*Taxpayers of Mich. Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ........................................................ 50

*Texas v. United States*,
    523 U.S. 296 (1998) ........................................................................ 42

*Wash. Env't Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ........................................................ 18

*Westlands Water Dist. v. Dep't of Interior*,
    376 F.3d 853 (9th Cir. 2004) .................................................... 54, 69

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
    5 F.4th 997 (9th Cir. 2021) ...................................................... 45, 46

*Wild Wilderness v. Allen*,
    871 F.3d 719 (9th Cir. 2017) .................................................... 55, 57

*WildEarth Guardians v. Salazar*,
    783 F. Supp. 2d 61 (D.D.C. 2011) .............................................. 7, 8

*WildWest Institute v. Bull*,
    547 F.3d 1162 (9th Cir. 2008) ........................................................ 58

*Zixiang Li v. Kerry*,
    710 F.3d 995 (9th Cir. 2013) .......................................................... 46

## FEDERAL STATUTORY AUTHORITIES

5 U.S.C. § 553 ..................................................................................... 36

5 U.S.C. § 704 ..................................................................................... 33

5 U.S.C. § 706(2)(A) ............................................................................ 19

28 U.S.C. § 1291 ................................................................... 4

28 U.S.C. § 1292(a)(1) ........................................................ 77

30 U.S.C. § 181 .................................................... 7, 38, 39

30 U.S.C. § 201(a)(1) ........................................................ 13

42 U.S.C. § 4332(2)(C) ..................................................... 32

42 U.S.C. § 4332(2)(C)(v) ................................................ 43

42 U.S.C. § 4332(C) .......................................................... 48

Pub. L. No. 94-377 (1976) ............................................... 38

## FEDERAL RULES AND REGULATIONS

40 C.F.R. § 1508.1 ............................................................ 65

40 C.F.R. § 1508.9(b) ....................................................... 70

40 C.F.R. § 1508.18 .......................................................... 48

40 C.F.R. § 1508.23 .......................................................... 32

40 C.F.R. § 1508.25 ................................................... 62, 63

40 C.F.R. § 1508.25(a)(1) ........................................ 63, 64

40 C.F.R. § 1508.25(a)(2) ........................................ 63, 65

40 C.F.R. § 1508.25(a)(3) ........................................ 63, 67

43 C.F.R. § 46.160 .................................................... 26, 32

43 C.F.R. § 3425.3(a) ......................................................... 8

44 Fed. Reg. 16,800 (Mar. 19, 1979), ............................... 7

44 Fed. Reg. 42,615 (July 19, 1979) ........................... 7, 38

46 Fed. Reg. 18,026 (Mar. 23, 1981) ............................. 72

47 Fed. Reg. 33,114 (July 30, 1982) ........................................................ 8

82 Fed. Reg. 16093 (Mar. 31, 2017) .................................................. 9, 10

86 Fed. Reg. 46,873 (Aug. 20, 2021) ................................................ 15, 27

86 Fed. Reg. 52,174 (Sept. 20, 2021) ..................................................... 27

Fed. R. App. P. 3(a)(1) ........................................................................... 5

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 5

Fed. R. Civ. P. 12(h)(3) .................................................................. 18, 28

## ADDITIONAL AUTHORITIES

Black's Law Dictionary (2nd ed. 1910) ................................................. 77

## INTRODUCTION

The district court's decisions on appeal strain the National Environmental Policy Act ("NEPA") beyond its breaking point. Plaintiffs[1] challenged solely a 2017 Department of the Interior ("Interior") Secretarial Order No. 3348 ( "Zinke Order")[2] that rescinded another 2016 Interior Secretarial Order No. 3338 entitled "Discretionary Programmatic Environmental Impact Statement [PEIS] to Modernize the Federal Coal Program" ("Jewell Order").[3] In 2021, Interior Secretarial Order 3398 ("Haaland Order")[4] rescinded and mooted the Zinke Order and renewed a programmatic review of federal coal leasing.

The district court nevertheless held that the defunct Zinke Order violated NEPA by ending the Jewell Order's *indisputably voluntary* programmatic NEPA review intended as a first step to explore possible changes to existing federal coal leasing regulations, and its similarly *voluntary* "pause" on "processing" certain lease applications *only* while

---

[1] This brief refers to the Appellee groups and Appellee states collectively as "Plaintiffs" unless otherwise indicated.

[2] 3-Excerpts of Record ("ER")-501—02.

[3] 3-ER-535—44.

[4] 2-ER-156—57.

that voluntary NEPA review was underway. In so doing, the district court transformed the Jewell Order's voluntary NEPA review and attendant pause into mandatory legal obligations. And after Interior obliged and performed a NEPA review, the district court found it insufficient because it did not speculate as to future changes in federal coal leasing policy. What is more, premised on a perceived NEPA violation, the district court manufactured a novel, indefinite injunction on future coal leasing, requiring "sufficient NEPA analysis before [Interior] resumes the Coal Leasing Program…." 1-ER-22.

This Court should reverse the district court on any of myriad grounds. At the outset, the district court lacked subject matter jurisdiction. But it refused to dismiss despite the sole basis of Plaintiffs' claims being mooted when Interior revoked the challenged Zinke Order via the Haaland Order and recommenced a programmatic review. Nor did Interior's mere commencement and later cessation of a voluntary NEPA review and pause—which neither disposed of a single acre or ton of federal coal, nor changed existing requirements including detailed NEPA review for issuing any new lease—constitute final agency action or cause injury to Plaintiffs to satisfy standing and ripeness.

2

Additionally, the district court erroneously expanded the plain scope of Plaintiffs' filed complaints against the Zinke Order, enabling Plaintiffs to use NEPA as a cudgel to maintain an improper programmatic judicial challenge to Interior's federal coal leasing policy. The single district court also seized control of all federal coal leasing litigation nationwide, via an advisory opinion on the defunct Zinke Order's NEPA compliance.

On the merits, no authority compels NEPA review to end voluntary NEPA review; that is, there is no such thing as NEPA on NEPA. Indeed, the district court contravened the D.C. Circuit's recent rejection of a new programmatic NEPA obligation to continue Interior's existing system of federal coal leasing, as well as the district court's own prior recognition that it could not expressly order such a programmatic review. Moreover, the district court identified no specific shortcoming of the unnecessary NEPA review Interior did perform on remand. Finally, the district court's remedy, rather than simply remanding to Interior or reinstating any status quo with a voluntary NEPA review and pause, impermissibly imposed a programmatic NEPA review and a prohibitory injunction on coal leasing. Unless corrected, the district court's errors threaten to open up countless other deliberative and inchoate agency processes to NEPA

challenges, and to bring other longstanding regulatory programs to sudden ends. For these and other reasons, the orders below cannot stand.

## STATEMENT OF JURISDICTION

Pursuant to Ninth Circuit Rule 28-2.2:

(A) The district court lacked subject matter jurisdiction over this action, *see infra* Argument Section I;

(B) This Court has jurisdiction under 28 U.S.C. § 1291 over these appeals of the district court's order entered on April 19, 2019, granting in part Plaintiffs' motions for summary judgment and denying in part Defendants' (including Appellants') cross-motions for summary judgment, 1-ER-27—60; and the district court's order entered on August 12, 2022, granting Plaintiffs' motions for summary judgment, denying Defendants' cross-motions for summary judgment, denying NMA's motion to dismiss for mootness, and finally disposing of all parties' claims, 1-ER-6—24;

(C) The filing dates establishing the timeliness of these appeals include the following: (i) on April 19, 2019, the district court issued an order finding it had subject matter jurisdiction, 1-ER-27—60; (ii) on May 22, 2020, the district court issued a remedy order and judgment and

invited Plaintiffs to file supplemental complaints, 2-ER-242—65, 1-ER-25—26; (iii) on July 20, 2022, Plaintiffs filed supplemental complaints, 2-ER-167—241; (iv) on August 12, 2022, the district court issued an order granting summary judgment for Plaintiffs, 1-ER-6—24; (v) on October 11, 2022, the district court ordered final judgment for Plaintiffs, 1-ER-1—5; and (vi) on October 7 and October 11, 2022, Appellants timely filed notices of appeal under Fed. R. App. P. 3(a)(1) and 4(a)(1)(B), 3-ER-529—34.

## STATEMENT OF THE ISSUES PRESENTED

(1) Whether the district court lacked subject matter jurisdiction over Plaintiffs' complaints because:

(A) The Zinke Order and its NEPA review are moot because Interior already administratively revoked the Zinke Order;

(B) The Zinke Order does not constitute final agency action under the Administrative Procedure Act ("APA");

(C) Plaintiffs lack standing;

(D) Plaintiffs' challenge is unripe; or

(E) Plaintiffs' complaints are an impermissible programmatic challenge to federal coal leasing policy.

(2) Whether the Zinke Order was a major federal action significantly affecting the quality of the human environment triggering NEPA review.

(3) Whether Interior's NEPA review was arbitrary and capricious.

(4) Whether the district court's remedy, though nominally purporting to "reinstate" the Jewell Order, improperly rewrote the Jewell Order to mandate a NEPA review and enjoin future federal coal leasing.

## STATEMENT OF THE CASE

## I. Overview of Federal Coal Leasing Regulations.

Interior's Bureau of Land Management ("BLM") manages coal leasing on approximately 570 million acres of land where the federal government owns the coal mineral estate. 3-ER-338. As of 2018, it currently administers nearly 300 leases covering over 450,000 acres across twelve states with roughly 6.5 billion tons of recoverable coal. 3-ER-338—39. Coal mining occurs on less than one percent of Interior-managed land, *see* 3-ER-338, and nearly 90% of that mining occurs in the Powder River Basin of Wyoming and Montana, *see* 3-ER-490. None occurs in New York, California, or Washington, and very little occurs in New Mexico.

6

Before 1973, Interior exercised its leasing authority under the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181 *et seq.*, "in a 'reactive' manner, processing lease applications on a 'case-by-case basis.'" *W. Org. of Res. Councils v. Zinke* ("*WORC*"), 892 F.3d 1234, 1238 (D.C. Cir. 2018) (quoting Dep't of Interior, BLM, Final Env't Statement, Fed. Coal Mgmt. Program, 1-9 ("1979 PEIS")). In the late 1970s, Interior decided the better course was to develop a "comprehensive planning system for future coal leasing." *Id.* To that end, Interior initiated notice and comment rulemaking on a new comprehensive coal leasing program, *see* 44 Fed. Reg. 16,800 (Mar. 19, 1979), and issued the 1979 PEIS to support its proposal, *see WORC*, 892 F.3d at 1238. Interior adopted comprehensive coal leasing regulations in July 1979. 44 Fed. Reg. 42,584, 42,615-28 (July 19, 1979).

The 1979 regulations set forth two distinct processes for coal leasing: "competitive regional leasing" and "leasing-by-application." *WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61, 63-64 (D.D.C. 2011). Competitive regional leasing proved unworkable. *See WORC*, 892 F.3d at 1238. Leasing-by-application is an applicant-driven process reviewing individual industry applications to lease coal. *See WildEarth*

*Guardians*, 783 F. Supp. 2d at 64. All individual coal leasing decisions are subject to NEPA review. *See, e.g.*, 43 C.F.R. § 3425.3(a).

In 1982, Interior adopted changes to the coal regulations to preserve their core features yet "eliminate burdensome, outdated and unneeded provisions." 47 Fed. Reg. 33,114 (July 30, 1982). The Secretary noted that an EA had been prepared and no new PEIS was required. *Id.* at 33,115. To "assess[] the environmental consequences of continuing the federal coal management program as modified," Interior published a supplemental PEIS in 1985. *WORC*, 892 F.3d at 1239 (quoting Fed. Coal Mgmt. Program, Final EIS Supplement (Oct. 1985) ("1985 Supplement")). There have been no new rulemaking efforts since 1985, including within and in response to the Jewell Order. *See id.*

## II. The Beginning and End of the Discretionary PEIS and Coal Leasing "Pause."

In January 2016, Secretary Sally Jewell issued the Jewell Order to "determine whether and how the current system for developing Federal coal should be modernized." 3-ER-535. The Jewell Order directed the preparation of a "*discretionary* [PEIS] … that analyzes potential leasing and management reforms to the current Federal coal program." 3-ER-535 (emphasis added). But the Secretary did not propose "any regulatory

8

action" because "the purpose of the [PEIS wa]s to identify, evaluate, and *potentially recommend reforms* to the Federal coal program." 3-ER-541 (emphasis added). In other words, she did not predetermine the findings of the PEIS or the outcome of any ensuing policy decisions by Interior. Interior indicated that the PEIS would be completed within approximately three years. 3-ER-335—36.

During its discretionary PEIS, the Jewell Order also "pause[d] coal leasing" to avoid potential economic harm from "locking in" leases for lengthy terms when those terms could change based on the PEIS's findings. 3-ER-542. While the Jewell Order excluded metallurgical coal leasing, emergency leasing, and other minor activities from the pause, it directed BLM to not "process" new applications for coal leases or modifications and, for pending applications, to not hold lease sales or issue leases or modifications. 3-ER-543. "Processing" or BLM consideration of received applications is just one step to actually issue any lease.

Fifteen months later, in March 2017, President Trump issued Executive Order 13783 ("EO 13783"). Promoting Energy Independence and Economic Growth, 82 Fed. Reg. 16093 (Mar. 31, 2017), 3-ER-503—

11. EO 13783 declared it "in the national interest to promote clean and safe development of our Nation's vast energy resources," and to "avoid[] regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." 3-ER-503. EO 13783 directed executive departments and agencies to revise or rescind existing regulations that "unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest." 3-ER-503—04. It also directed the new Interior Secretary, Ryan Zinke, to "take all steps necessary and appropriate to amend or withdraw" the Jewell Order, "to lift any and all moratoria on Federal land coal leasing activities," and to "commence Federal coal leasing activities consistent with all applicable laws and regulations." 3-ER-509.

Prior to the Zinke Order, the Acting BLM Director issued a memorandum detailing why the Jewell Order's discretionary PEIS was unnecessary. 3-ER-512—25. He explained that the issues identified in the PEIS's scoping report, including the need to obtain a "fair return" for federal coal leases, "have been or continue to be addressed through BLM's program review outside of the PEIS process, and completion of the PEIS is not necessary to implement any reforms that the BLM may determine

to be appropriate." 3-ER-513—14; *see also* 3-ER-513—21 (reviewing fair return, climate change, resource protection and management, and program administration issues). Congress also did not allocate funding for the PEIS in the FY2017 budget, and even so, the estimated cost to complete the PEIS ($12 million) exceeded BLM's entire annual coal management budget ($10 million). *See* 3-ER-522. The Acting Director further observed that the costs and economic hardships associated with the PEIS and pause outweighed any benefit of the voluntary PEIS. *See* 3-ER-523—25.

Secretary Zinke then issued the Zinke Order, which revoked the Jewell Order and encouraged "efforts to enhance and improve the Federal coal leasing program" given the program's "critical importance to the economy." 3-ER-501. The Zinke Order revoked the Jewell Order because "the public interest is not served by halting the Federal coal program for an extended time, nor is a [PEIS] required to consider potential improvements to the program." *Id.* BLM accordingly ceased preparation of the PEIS and thereby resumed processing coal leasing applications. 3-ER-502.

11

## III. District Court Orders Interior to Prepare a NEPA Analysis for the Zinke Order, and Interior Does So.

Plaintiffs challenged the Zinke Order arguing that it was a final, major federal action that triggered the procedural requirements of NEPA, and that the Zinke Order violated NEPA and the APA because Interior was required to complete a PEIS before revoking the Jewell Order. 1-ER-27—60. The district court held that it had subject matter jurisdiction and that the Zinke Order was a major federal action sufficient to trigger NEPA, *see* 1-ER-49—50, but it also found that it could not "compel [Interior] at this time to prepare a PEIS, or supplemental PEIS, as Plaintiffs request," *see* 1-ER-55. Interior then initiated NEPA review of the Zinke Order. *See* 3-ER-404—07.

In February 2020, Interior published its final Environmental Assessment ("EA"), which analyzed the environmental consequences of the Zinke Order as the proposed action. 3-ER-332—97. Interior explained that the EA's purpose and need was to respond to the district court's April 2019 order. *See* 3-ER-342. It further explained that because Congress denied the funds necessary to complete the PEIS, the practical effect of the Zinke Order was to "ratif[y] Congress's effective cancellation of the PEIS." *Id.*

12

The EA considered a "no action alternative," which reviewed the environmental impacts without the Zinke Order, and the "proposed action," which reviewed those impacts assuming normal lease processing. 3-ER-347—49. When setting the parameters for the "no action alternative," Interior rejected a "no leasing" option because a permanent pause on leasing is contrary to the MLA's express direction that federal lands shall be offered for leasing. 3-ER-347 (citing 30 U.S.C. § 201(a)(1)). And because the Jewell Order imposed no such permanent pause and had planned on completing the PEIS by March 2019, Interior determined that under the "no action alternative" the processing of non-exempt leases would not have been paused beyond March 2019. *Id.*

Interior approved six federal coal leases between the March 2017 Zinke Order and March 2019, two of which were exempt under the Jewell Order and thus omitted from EA consideration. 3-ER-341—42. Interior eliminated several other alternatives proposed in comments because none met the purpose and need of the proposed action. 3-ER-350. Nor could Interior blindly speculate as to potential future regulatory changes. Interior concluded that processing four federal coal lease applications

earlier under the Zinke Order would have no significant impacts and thus issued a Finding of No Significant Impact ("FONSI"). 2-ER-67—77.

## IV. District Court Rejects Plaintiffs' Request for a PEIS, and Plaintiffs Challenge Interior's NEPA Analysis.

The district court deferred ruling on remedy until after Interior completed its NEPA review. 3-ER-398—403. Plaintiffs were not content with the EA and FONSI. After receiving further remedy briefing, the district court found that "Plaintiffs essentially repeat their request for the Court to order a programmatic review and preparation of a PEIS," and concluded that it "had already considered and declined to impose this request on [Interior]." 2-ER-256—57. The court took no position on the adequacy of the Final EA and FONSI but invited Plaintiffs to challenge them in a new or supplemental complaint. *See* 2-ER-261—63.

In July 2020, the district court granted Plaintiffs leave to file supplemental complaints challenging Interior's NEPA analysis. 2-ER-165—66. As relevant here, Plaintiffs alleged that Interior's analysis in the EA violated NEPA in three ways: (1) its scope was impermissibly narrow; (2) it failed to take a hard look at the impacts of the "federal coal program"; and (3) it failed to consider a reasonable range of alternatives, namely a permanent end to federal coal leasing. 2-ER-186—92; 2-ER-

222—30.  Among other things, Plaintiffs also alleged that the EA and FONSI failed to consider royalty reform, carbon budgeting, and methane emissions mitigation.  2-ER-226.

## V.     Secretary Haaland Revokes the Zinke Order.

In April 2021, Secretary Deb Haaland revoked the Zinke Order.  2-ER-156—57.  Interior then published a notice of intent to review the federal coal leasing program.  *See* 86 Fed. Reg. 46,873 (Aug. 20, 2021).  That review remains ongoing.  *See* 2-ER-142—43.

Following the Haaland Order, the district court stayed the litigation while Interior recommenced a programmatic review of the federal coal leasing program.  1-ER-11.  Not satisfied with the progress in those six months—even though the Jewell Order contemplated *three years*—Plaintiffs sought to resume the litigation and the district court obliged.  *Id.*

## VI.    District Court Grants Plaintiffs' Requested Relief: Injunction and PEIS by Any Other Name.

Plaintiffs moved for summary judgment, challenging the adequacy of Interior's NEPA analysis for the Zinke Order.  1-ER-7—8.  Defendants moved to dismiss for lack of jurisdiction, arguing that the Haaland Order mooted any live controversy (which never existed in the first place), and

cross-moved for summary judgment on the basis that the NEPA analysis was sufficient. 1-ER-8. The district court denied the motion to dismiss and granted summary judgment in favor of Plaintiffs on their NEPA claim. *Id.*

The district court found that "[t]he Haaland Order revokes the Zinke Order by name," but that because the Haaland Order did "not resume[] the coal leasing moratorium, the Zinke Order still remains in partial effect." 1-ER-15. The district court further believed that it could grant effective relief despite Interior's rescission of the Zinke Order, such as "requiring sufficient environmental analysis under NEPA." 1-ER-16.

The district court also found that Interior's consideration of two alternatives and the four leases traceable to the Zinke Order failed NEPA's "hard look" requirement and was thus arbitrary and capricious. 1-ER-17—18. It took issue with two aspects of Interior's analysis in particular: (1) failing to consider a "no leasing" alternative; and (2) failing to consider the "baseline" of an "indefinite moratorium." *See* 1-ER-18—19. It concluded that a "no leasing" alternative was necessary because the "status quo" was a leasing moratorium, not the longstanding federal coal leasing regulations and their *supporting 1979 PEIS and 1985*

*Supplement. See id.* And it found that Interior's three-year estimate to complete the Jewell Order PEIS—the only timeframe supported by the record—was arbitrary because the Jewell Order never said "that the moratorium would end upon completion [of the PEIS]." 1-ER-19.

While the district court insisted that "reinstating the PEIS is not a potential remedy in this litigation," it said it "will require sufficient NEPA analysis before BLM resumes the Coal Leasing Program." 1-ER-21—22. What would that entail? The district court said consideration of "the full scope of the Zinke Order's effect on *all* then-pending lease applications, *and* other connected, cumulative, or similar actions." 1-ER-22 (emphasis added). The district court identified no specific missing information in the EA and FONSI, and nothing Interior could omit from the Jewell Order PEIS while passing muster with the district court. And pending a second remand, the district court severed the Jewell Order's PEIS and pause and instead reinstated the "coal leasing program moratorium established by the Jewell Order." 1-ER-24.

## STANDARD OF REVIEW

Whenever a court determines "that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3);

17

*see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction … may be raised by a party, or by the court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."). And this Court "review[s] de novo the district court's assumption of jurisdiction." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013).

Appellate courts review challenges to final agency actions under the APA, which requires courts to uphold those actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). An agency decision is arbitrary and capricious only if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1244 (9th Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

This standard is "highly deferential." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 866 (9th Cir. 2017). Courts presume that the agency action is valid and will affirm "if a reasonable basis exists for its decision." *Id.* Courts "may not 'substitute [their] judgment for that of the agency.'" *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## SUMMARY OF ARGUMENT

The district court's errors all stem from a fictional construct of what Interior did (and did not do) in this case. The district court adopted Plaintiffs' misportrayal that Interior somehow ended all federal coal leasing in the Jewell Order by ordering a free-standing "moratorium," and then "restarted" leasing in the Zinke Order without sufficient NEPA review. That is demonstrably false based on even a cursory reading of the Jewell Order's plain terms—including its first word, "Discretionary."

In reality, the Jewell Order merely began an exploratory NEPA review intended to determine whether even to propose changes to federal coal leasing regulations, and "paused" certain leasing decisions solely for purposes of that review. That is, the Jewell Order's voluntary NEPA review and pause were *inseparable*; the latter could not exist without the

19

former. In turn, the Zinke Order deemed the voluntary NEPA review unnecessary in light of other Departmental priorities, and thereby also ended the voluntary associated "pause." *Nothing more occurred here.* Tellingly, the Zinke Order approved *zero* new federal coal leases, any of which continues to require its own NEPA review under longstanding law.

Yet the district court inexplicably rewrote the Jewell Order by finding that "the leasing moratorium represents a distinct target of this litigation," purporting to "reinstate" only the pause, and enjoining leasing until Interior completes a new programmatic review that "complies with NEPA"—even though the district court "stated previously that reinstating the PEIS is not a potential remedy in this litigation." 1-ER-21, -24. The district court thereby indulged Plaintiffs' unabashed policy goal to end federal coal leasing in one fell swoop—the core reason Plaintiffs brought this case—premised solely on Interior's earlier commencement of a voluntary NEPA review. This Court should reverse.

1.     The district court lacked subject matter jurisdiction since this litigation began in 2017, and especially when it issued final judgment in October 2022.

a.  This litigation is ineluctably moot.  Plaintiffs' filed and refiled complaints expressly challenged *only* the Zinke Order and its NEPA review.  But the district court could not re-vacate the Zinke Order that had already been wholly and permanently vacated *more than a year earlier* via Interior's Haaland Order, and nothing in the record suggests otherwise.  In turn, any opinion on the sufficiency of NEPA review for the moot Zinke Order is likewise moot and an improper advisory opinion.  To be sure, with Plaintiffs' concurrence, the district court stayed this litigation while Interior conducted its recommenced programmatic review after the Haaland Order.  Plaintiffs and the district court then reversed course and revived NEPA claims against the Zinke Order when Plaintiffs complained that Interior's inability to complete a three-year task in six months was "a lack of progress."[5]  If Plaintiffs disagreed with the Haaland Order, they were free to challenge it, but they never did.  The district court erred in denying mootness.

---

[5] The district court nowhere explained why the stay was no longer proper or depended on Plaintiffs' shifting preferences.  Just as the district court conjectured that "[a]nalyses from the [Jewell Order's] PEIS might have informed BLM's future actions regarding the moratorium," the outcome of the Haaland Order's programmatic review might have informed, or obviated, resolution of this litigation.  1-ER-19.

b.     The Zinke Order was not a final agency action under the Supreme Court's well-established standard.  First, it consummated no agency decision.  The Jewell Order's entire purpose was to explore *if* any policy changes *might* be warranted for federal coal leasing, and the Zinke Order nowhere foreclosed consideration of future policy changes.  Indeed, *even if there were no Zinke Order*, Interior could simply have elected to stop the Jewell Order's voluntary exercise.  Second, the Zinke Order did not alter anyone's legal rights—it expressly states as much.  Prior to this case, no court had found a secretarial order justiciable.  And existing federal coal leasing requirements were unaffected, including every lease first undergoing its own robust NEPA review and withstanding any judicial review.

c.     Plaintiffs lack standing.  The Zinke Order visits no injury on Plaintiffs (or anyone else).  Namely, it disposed of no federal coal.  In addition, the preexisting Jewell Order did nothing more than embark on a discretionary NEPA review to which Plaintiffs held no entitlement.  Tellingly, Plaintiffs' claims of rampant coal leasing and widespread injuries ascribed to the Zinke Order never materialized in

the more than five years between the Zinke Order and the district court's final judgment.

        d.    This litigation is unripe. Until Interior elects to revise its regulations or to dispose of federal coal, any complained-of injury is premature, at best. Though Plaintiffs concurred that Interior's ongoing programmatic review could address their concerns, they refused to let it conclude in due course. And Plaintiffs here do not, and cannot, challenge the legality of decades-long existing regulations.

        2.    The district court's endorsement of Plaintiffs' desired sweeping goals—which they could not obtain from Congress or Interior— represents improper judicial policymaking under the guise of NEPA that courts have long denounced. Case law makes clear that NEPA is not a tool to judicially resolve policy differences. But under the rulings below, an agency undertaking a programmatic NEPA review to examine proposed changes to its existing rules—or, as here, whether even to propose any changes—could be locked into completing that NEPA review, even if the agency later decides to dedicate its finite resources elsewhere, to abandon an underlying proposal, or to pursue a different one. Rather,

the proper course under NEPA is to await an actual proposal or approval and then evaluate its NEPA compliance.

3. Even if the district court had jurisdiction (it did not), it erred in holding that the Zinke Order triggered its own NEPA review by halting a voluntary earlier NEPA review and pause. The district court cited nothing legally requiring the Jewell Order's NEPA review or pause, and Interior did not create any such obligation by merely starting them. In fact, Plaintiffs' claims here are functionally indistinguishable from the failed claims in *WORC*, where similarly oriented groups complained that the existing federal coal leasing regulations and their underlying NEPA review are outdated and that Interior should be judicially forced to redo them. That is, the NEPA review that Plaintiffs seek to compel here is the same PEIS that *WORC* held was legally unnecessary. But the D.C. Circuit unanimously ruled the agency has no obligation to prepare a NEPA review for its federal coal program unless it proposes new regulations. The Zinke Order's existence cannot distinguish *WORC*, particularly as *WORC* included the Jewell and Zinke Orders within its conclusion that there was no major federal action triggering NEPA

review.  *E.g.*, 892 F.3d at 1241.  At base, NEPA's procedural mandate is look before you leap—*not* look in case you might later propose to leap.

4.    Next, Interior's detailed NEPA review on remand tailored to the Zinke Order was consistent with the district court's first summary judgment order and amply sufficient under NEPA.  The district court conceded that it could not compel a PEIS like the Jewell Order, yet faulted Interior for failing to prepare one by any other name.  Namely, the district court criticized Interior for not speculating about limitless future programmatic policy reforms and impacts over an indefinite time horizon.  There is no daylight between the Jewell Order's PEIS and the NEPA review that Plaintiffs demand and the district court ordered.  The district court's holding also contradicts its refusal to further stay this litigation because the outcome of Interior's recommended voluntary programmatic review of federal coal leasing is speculative—the myriad potential outcomes of the Jewell Order's PEIS or the district court's ordered NEPA analysis are no less speculative.  Regardless of any NEPA process Interior undertakes, Plaintiffs will contend it is inadequate and continue to press this litigation (already six years old) until Interior

concurs with Plaintiffs' *substantive policy conclusion* that federal coal leasing cannot continue.

5. Finally, the district court's ordered remedy is overreaching and baseless. The district court purported to "vacate" an already-vacated Zinke Order, and "reinstate" a standalone moratorium that *had never existed*. Indeed, the Jewell Order said that its voluntary PEIS warranted its voluntary "pause" on processing of some lease applications during the PEIS, *not* that its "pause" warrants a PEIS. Applicable Interior regulations provide the opposite, i.e., that rulemaking typically does *not* warrant a pause of existing regulations. *See* 43 C.F.R. § 46.160. Thus, whatever NEPA shortcoming it misperceived, the district court had no authority to effectively and indefinitely enjoin federal coal leasing until Interior brings forth a different document that passes muster with Plaintiffs and the district court.

ARGUMENT

## I. Plaintiffs Fail to Establish Subject Matter Jurisdiction.

### A. Plaintiffs' claims are moot.

Plaintiffs' complaints plainly challenge *only* the 2017 Zinke Order.[6]

The 2021 Haaland Order, however, expressly vacated the Zinke Order:

"The following Secretary's Orders (SO) have been found to be inconsistent

with, or present obstacles to, the policy set forth in [Executive Order]

13990 and are hereby revoked: SO 3348 – 'Concerning the Federal Coal

Moratorium' (March 29, 2017)." Soon afterward, "to further the goals of

the Haaland Order," Interior issued a "Notice of Intent To Conduct a

Review of the Federal Coal Leasing Program and To Seek Public

Comment," thereby "beginning a new review of the Federal coal leasing

program." 86 Fed. Reg. 46,873, 46,874 (Aug. 20, 2021); *see also* 86 Fed.

Reg. 52,174 (Sept. 20, 2021) (extending public comment period for same).

---

[6] *E.g.*, 2-ER-168 (Plaintiff groups "file this supplemental complaint as a continuation of their challenge to … Federal Defendants' 2017 decision …"); 2-ER-169 ("This case challenges Federal Defendants' decision to issue Secretarial Order 3348 (the 'Zinke Order') issued on March 29, 2017…."); 2-ER-194 ("Set aside and vacate the Zinke Order;"); 2-ER-199 (Plaintiff states alleging "Defendants' issuance of Secretarial Order 3348 on March 29, 2017" and "Defendants' issuance of a Final EA and FONSI on February 26, 2020" constitute the requisite "final agency action" for jurisdiction); 2-ER-232 ("Issue an order requiring Defendants to vacate and set aside Secretarial Order 3348….").

27

Meanwhile, Interior has not heeded the former Zinke Order's urging to "process" lease applications "expeditiously in accordance with regulations and guidance existing before the issuance of [the Jewell Order]." 3-ER-502. Rather, Interior "has not approved a new coal lease sale since the Biden Administration took office." 86 Fed. Reg. at 46,874.

Though Plaintiffs want the Haaland Order to mirror the Jewell Order's "pause," they never challenged the Haaland Order. And if Plaintiffs wish to challenge any future issued coal lease, they can do so. But the present litigation concerning the defunct Zinke Order and NEPA analysis is now moot.

Mootness ensures adjudication of only "actual, ongoing controversies between litigants." *Deakins v. Monaghan*, 484 U.S. 193, 199 (1988). "The inability of the federal judiciary 'to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (citations omitted). "It is not enough that a controversy existed at the time the complaint was filed…." *Id.* Rather, "at any time" the court lacks jurisdiction, it "must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also*

28

*Preiser v. Newkirk,* 422 U.S. 395, 401-02 (1975) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.") (citation omitted). Mootness of pled claims cannot be avoided based on claims "beyond the complaint in this case." *See Chem. Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 877 (9th Cir. 2006).

Here, there is no live controversy regarding the Zinke Order or its NEPA analysis. The district court cannot render advisory opinions like it did here. *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions.") (citation omitted). Nor does any exception to mootness apply, and Plaintiffs have not contended otherwise. Interior's federal coal leasing actions are not "capable of repetition while evading review," as Plaintiffs routinely litigate them. *See, e.g., Pub. Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1459-60 (9th Cir. 1996). And actions surrounding the discretionary PEIS and its temporary leasing pause were "facts that are unique or unlikely to be repeated." *See id.* at 1459-60. Nor does the record suggest that Interior

29

issued the Haaland Order as "voluntary cessation" intended to moot this litigation or to commit illegal conduct. *See id.* at 1460.

This Court's precedent also supports mootness here. For example, in *League of Conservation Voters v. Biden*, a President Biden Executive Order revoked a President Trump Executive Order, which in turn had revoked a President Obama Executive Order withdrawing certain Outer Continental Shelf areas from development. 843 Fed. App'x 937, 938 (9th Cir. 2021) (unpublished). The Court held a challenge to the Trump Executive Order was moot "[b]ecause the terms of the challenged Executive Order are no longer in effect." *Id.* Similarly, this Court mooted a challenge to a permit authorizing cross-border pipeline construction because that permit was revoked and replaced with a newly issued permit. *Indigenous Env't Network v. Trump*, No. 18-36068, ECF No. 56 (9th Cir. June 6, 2019). This Court likewise has found mootness where, as here, plaintiffs seek to preempt future agency decisions and NEPA reviews that have not even occurred, based on a fear that they will be legally insufficient. *See, e.g., Native Vill. of Nuiqsut v. BLM*, 9 F.4th 1201, 1205 (9th Cir. 2021) ("[W]hen the environmental report at issue has been superseded, and the federal agencies will rely on a new and

different report for the near future, the case is moot.") (quotations omitted); *Headwaters, Inc. v. BLM*, 893 F.2d 1012, 1015-16 (9th Cir. 1989) ("The application of the disputed policies to future sales is too uncertain, and too contingent upon the BLM's discretion, to permit declaratory adjudication predicated on prejudice to Headwaters' 'existing interests.' … We conclude, therefore, that Headwaters' claim for declaratory relief is also moot.") (citations omitted).

The district court denied mootness by incorrectly insisting that "Plaintiffs retain a potential remedy through NEPA, because the Haaland Order does not return the status quo that existed under the Jewell Order." 1-ER-14. Specifically, the district court bootstrapped its earlier finding of NEPA applicability to the Zinke Order to further find that "the Haaland Order maintains the potential environmental harm that could result from lifting the coal leasing moratorium." 1-ER-15. But the Jewell Order established no such "status quo" with a fixed "moratorium" divorced from its *voluntary PEIS* serving as the *condition precedent* for any pause. Nor did the Zinke Order ending the basis for the pause "harm" Plaintiffs in the first place.

The district court also erred in claiming that Interior "remains free to lease federal lands for coal development despite Plaintiffs' alleged NEPA violations," when it is undisputed that BLM must satisfy all applicable legal requirements for federal coal leasing, including subjecting any proposed lease sale to NEPA review. 1-ER-16 ; *see also* 43 C.F.R. § 46.160. Moreover, the district court's assertion that "Plaintiffs correctly argue that further environmental review could alleviate potential harms done while the Zinke Order improperly remained in effect were BLM to identify potential mitigation measures during an adequate analysis," 1-ER-16, is nonsensical and wholly speculative— particularly as NEPA is purely procedural and inherently not retroactive but forward-looking for federal agency "proposals." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.23 (2019).[7] Most importantly, even if the district court could "reinstate" the Jewell Order by "vacating" the Zinke Order, the Jewell Order's contents were wholly voluntary and non-binding, so the resulting "status quo" would be the same. *See* 1-ER-17.

---

[7] This brief cites NEPA regulations in effect when the Zinke Order and its EA and FONSI were issued. Regulatory amendments effective January 1, 2021 and codified at 40 C.F.R. parts 1500-1508 do not materially affect the cited provisions.

Even if the Zinke Order ever provided Plaintiffs a proper jurisdictional toehold in this Court (it did not), it is now gone. There is no Article III case or controversy on the adequacy of a defunct NEPA review for the already-vacated Zinke Order. Neither Plaintiffs nor the district court explain why the Zinke Order's NEPA review matters at all anymore. It does not, and this litigation is moot.

## B.    The Zinke Order was not a final agency action.

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. A purportedly final agency action must satisfy two well-established criteria. "First, the action must mark the consummation of the agency's decisionmaking process … it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). The Zinke Order fails both criteria.

First, neither the Jewell Order nor the Zinke Order finally decided anything. Per its plain text, the Jewell Order did "not propos[e] any regulatory action at this time," and did not prejudge any existing lease

terms "*that the PEIS may* ultimately determine to be less than optimal." 3-ER-541—42 (emphasis added). Rather, "the purpose of the PEIS [was] to identify, evaluate, and *potentially recommend* reforms to the Federal coal program." 3-ER-541 (emphasis added). Nor did the Jewell Order even mandate completion of its discretionary PEIS. It was effective only until "amended, superseded, or revoked, whichever occurs first"—which the Zinke Order did. 3-ER-544. That is consistent with the absence of any legal obligation to prepare a new PEIS, or to pause the operation of existing regulations, during any programmatic NEPA review, so long as individual leasing decisions continue to undergo NEPA review (which they must). At most, the Jewell Order *embarked* on a programmatic review of potential regulatory changes, and the Zinke Order made no decision on any lease application nor precluded any future regulatory changes.[8]

At base, the Jewell Order beginning the voluntary PEIS and pause was not itself a programmatic decision, and neither was the Zinke Order stopping them. These circumstances are hardly Interior's "last word on

---

[8] *See, e.g*, 3-ER-350 ("[C]anceling preparation of the PEIS does not preclude the BLM from making future improvements to the Federal coal leasing program.").

the matter"—as further evidenced by the Haaland Order's ongoing programmatic review. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006) (the action "must not be of a merely tentative or interlocutory nature"). To hold otherwise would subject the mere continuation of existing regulations to interminable legal challenges. *See ONRC Action v. BLM*, 150 F.3d 1132, 1135 (9th Cir. 1998) (rejecting argument that a "decision not to change the status quo is a final agency action challengeable under the APA").

Second, no Secretarial Order altered anyone's legal rights or created legal consequences. Their function is "to improve the internal management of the Department" of the Interior. 3-ER-502. By their plain terms, they create no rights.[9] As a matter of law, a secretarial order cannot amend substantive law without new legislation or notice and comment rulemaking. 5 U.S.C. § 553; *Earth Island Inst. v. Carlton*, 626

---

[9] 3-ER-544("This Order and any resulting report or recommendation are not intended to, and *do not, create any right or benefit, substantive or procedural, enforceable at law or equity* by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.") (emphasis added); 3-ER-502 (same); 2-ER-157 (same).

F.3d 462, 473-74 (9th Cir. 2010) (no legally enforceable obligation absent procedural rulemaking requirements). Indeed, the Jewell Order was only considering whether to develop and propose notice and comment rulemaking. That is why no prior court has vacated a secretarial order or resuscitated a previous secretarial order.

Critically, the Jewell Order did *not* change the law or create an independent moratorium on federal coal leasing. It merely temporarily "pause[d]" the "process[ing]" of some coal leasing applications—not for the pause's own sake, but only "until the completion of the PEIS." 3-ER-542—43. Thus, the sole function of the pause on processing applications was to prepare a discretionary PEIS. Even the district court previously admitted as much. 1-ER-30 ("[T]he Jewell Order imposed a moratorium on new coal leasing until completion of the PEIS."). A pause, in this instance, is not a "permanent termination." *Krueger v. Morton*, 539 F.2d 235, 240 (D.C. Cir. 1976). Moreover, the Jewell Order excluded many federal coal applications and operations from its pause pending completion of its PEIS. 3-ER-543—44. It also expressly "does not apply to other BLM actions related to the Federal coal program," including "development and implementation of resource management plans"

36

specifying where federal coal leasing is appropriate. 3-ER-543. Conversely, the Zinke Order's mere revocation of the Jewell Order made no decisions on federal coal planning, leasing, or development.

The district court's contrary finding of a justiciable final agency action instead imagined a different Interior action. For example, the district court misstated that "Plaintiffs' claims target Secretary Zinke's decision to rescind the moratorium on federal coal leasing and to re-open federal public lands to new coal mining." 1-ER-16. That contradicts the district court's own recognition elsewhere that the Jewell Order PEIS and pause are inextricably intertwined. 1-ER-30. In reality, the Zinke Order did not "re-open" anything; rather, existing statutes and regulations prescribe available lands and requirements for federal coal leasing. *See, e.g.*, 30 U.S.C. § 181 *et seq.* (MLA, as amended by the Federal Coal Leasing Amendments Act of 1976 (Pub. L. 94-377)); 43 C.F.R subparts 3425 & 3432; 44 Fed. Reg. 42,615 (July 19, 1979) (establishing current federal coal leasing regulations). The Zinke Order, at most, replaced the welcome mat to leasing applicants that the Jewell Order had temporarily placed in storage. But it did not even do that, as Interior approved only four leases—*zero* leases under the current

Administration—even while the Zinke Order was effective before Interior vacated it.

The district cited *no* authority that cessation of an ongoing NEPA process, or a pause accompanying that NEPA process, is itself reviewable final agency action. Case law instead specifies the opposite. For example, on similar claims by one of the same plaintiffs in this case, a court held that "absent a preexisting legislative (or otherwise legally binding) duty to complete a task, an agency does not spawn such a duty simply by commencing the task," and rejected that "an agency can convert a voluntary task into a mandatory one simply by embarking on it." *Ctr. for Biological Diversity ("CBD") v. Zinke*, 260 F. Supp. 3d 11, 23 (D.D.C. 2017); *see also id.* at 27-28 ("[N]either the agency's ongoing deliberations about whether or not to revise agency procedures nor its decision to leave current procedures intact for the time being qualifies as a discrete agency action that would give rise to a legal challenge under § 706(1) or § 706(2) of the APA."); *ONRC Action*, 150 F.3d at 1137 ("BLM's failure to implement a moratorium [on logging and other activities] was not a final agency action" pending completion of a NEPA review for developing an ecosystem management strategy); *Northcoast Env't Ctr. v.*

*Glickman*, 136 F.3d 660, 669 (9th Cir. 1998) (preliminary research and development efforts are not an agency action under the APA or a trigger for NEPA review). That is unsurprising since, like here, proposed agency actions and NEPA reviews frequently are withdrawn or never completed. And like here, they are not judicially reviewable final agency actions, let alone NEPA violations.

### C.    Plaintiffs failed to establish Article III standing.

The "irreducible constitutional minimum of standing contains three elements": (1) "injury-in-fact, that is, injury which is 'concrete and particularized' … and 'actual or imminent, not 'conjectural' or 'hypothetical,'" (2) a "causal connection" that is "fairly traceable" between the alleged injury and Interior's alleged misconduct; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted); *see also Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (standing requires an "imminent injury on account of the defendant's conduct," and cannot be based on "speculation or 'subjective apprehension' about future harm"). *Plaintiffs* alone bear the burden to clearly demonstrate all three prerequisites for standing.

*E.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  They did not do so here, and the district court erred in concluding otherwise.

Plaintiffs alleged harms to their environmental interests from actual coal leasing and development.  But they failed to show any concrete and imminent injury caused by the Zinke Order, which authorizes no such activities.  Like the Jewell Order, the Zinke Order created no legally enforceable right or benefit; rather, it was "intended to improve the internal management of the Department."  3-ER-502.  No party disputes that each Interior federal coal decision of which Plaintiffs may complain first requires separate agency action and undergoes extensive NEPA review, including cumulative impacts, and is subject to public notice and comment.  Interior's continued work in processing other pending applications and conducting associated NEPA reviews likewise neither harms Plaintiffs nor results in any irreversible and irretrievable commitment of resources absent issuance of new leases.

Simply put, though Plaintiffs may disagree with the Zinke Order, it did not harm any of their cognizable interests.  The Zinke Order neither compels nor prohibits any activity by Plaintiffs, including challenging any actual final agency action on a federal coal lease as they often do.

Plaintiffs cannot show how the Zinke Order deprived them of any coal leasing participation, NEPA review, or future regulatory changes.

The district court invoked an alleged NEPA "procedural" injury, 1-ER-35—36, but that does not excuse Plaintiffs' standing burden. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("a procedural right *in vacuo*" does not confer standing); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) (a "person with standing" may bring a NEPA procedural claim). The salient point is not that programmatic NEPA reviews are unchallengeable, but that the underlying programmatic agency actions must cause injury to Plaintiffs—such as by "pre-determin[ing] the future," as in the district court's inapposite citation of *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1994) (internal quotations omitted). Here, all Plaintiffs can point to from the Zinke Order is renewed BLM processing of applications under applicable requirements, and no directed decision on any lease, much less "production, transportation, and/or consumption of coal" or actual "coal mining" on which the district court relied. 1-ER-37—38. The district court disregarded the many applicable requirements for such on-the-ground activities. Contrary to binding precedent, the district court's

ruling threatens to waive standing whenever a plaintiff alleges NEPA procedural injury and should be reversed on that ground.

### D. Plaintiffs' claims are unripe.

Article III of the Constitution ensures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974). Moreover, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Ohio Forestry,* 523 U.S. at 732-33 (ripeness avoids judicial entanglement in "abstract disagreements over administrative policies") (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)).

In NEPA parlance, the Zinke Order makes no "irreversible and irretrievable commitments of resources," so Plaintiffs' claims are premature, at best. *See* 42 U.S.C. § 4332(2)(C)(v); *see also Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 234, 245-46 (D.D.C. 2014) (plan to allow local fishermen to apply for permission to access new areas not ripe under NEPA). The district court's one-page ripeness ruling simply

restated its same flawed "procedural injury" finding for standing and continued to mischaracterize the Zinke Order. 1-ER-39—40. Nor are Plaintiffs entitled to an "opportunity to challenge [the coal-leasing program] on a nationwide, programmatic basis," where Interior has not proposed changes to its regulations. 1-ER-40 (quoting *Cal. ex rel. Lockyer v. U.S. Dept. of Agriculture*, 575 F.3d 999 (9th Cir. 2009)). Unlike the preexisting and challenged substantive rulemakings in *Lockyer*, the applicable "coal-leasing program" is unchanged by the Zinke Order. Plaintiffs' claims are unripe and should be dismissed on that ground, too.

## II. Plaintiffs' Claims Are Nonjusticiable Because They Constitute an Impermissible Programmatic Challenge.

The district court utterly failed to address Intervenors' arguments and authority demonstrating that this litigation is an unreviewable policy disagreement. Plaintiffs brought this litigation asking the district court to unilaterally make federal coal policy and enjoin leasing—and the district court ultimately was eager to oblige. Indeed, Plaintiffs' insistence on pressing their claims even during Interior's recommended programmatic review under the Haaland Order further reveals that Plaintiffs' actual interest lay not in additional review, but rather in impermissibly preordaining and dictating the outcome of that review.

43

But, fundamentally, it is not Plaintiffs' or courts' prerogative to prescribe federal lands policy or to ban new leasing when Congress or Interior have not done so. NEPA cannot be abused in furtherance of this substantive policy end. *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987) ("NEPA was not intended to resolve fundamental policy disputes."). Because "[a] policy disagreement, at bottom, is the gravamen of appellants' complaint," this Court should decline to "extend NEPA as far as [appellant would take] it." *Id.*; *see also Grunewald v. Jarvis,* 776 F.3d 893, 903 (D.C. Cir. 2015) ("NEPA is 'not a suitable vehicle' for airing grievances about the substantive policies adopted by any agency, as 'NEPA was not intended to resolve fundamental policy disputes.'") (citation omitted).

The district court's arrogation of Interior's authority runs directly afoul of the Supreme Court's and other courts' consistent rejection of attempts to attack an entire agency program and judicially effectuate wholesale policy change. For example, in a case involving another asserted Interior "program" for managing federal lands, the Supreme Court held that "the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint and

presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890-93 (1990); *see also id.* at 891 ("But respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.") (emphasis in original). While the "case-by-case approach" may be "frustrating" for Plaintiffs, "more sweeping actions are for the other branches." *Id.* at 894.

It is axiomatic that courts interpret rather than make law. This Court recently explained that plaintiffs "may think that the third branch is more convenient or accessible, but the APA—consistent with Article III—will not permit such forays outside the 'traditional, ... normal[] mode of operation of the courts,' which remains limited to 'controvers[ies] ... reduced to more manageable proportions.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021). Moreover, "this limitation on judicial review precludes 'broad programmatic attack[s],' whether couched as a challenge to an agency's action or 'failure to act.' ... Plaintiffs cannot obtain review of all of [agency] individual actions pertaining to, say, 'employment-based

immigration' in one fell swoop by simply labeling them a 'program.'" *Id.* at 1010-11 (citations omitted). *Whitewater* is no outlier.[10]

Although squarely presented with this overwhelming authority, the district court ignored it to fashion the federal coal policy that Plaintiffs desired. This Court should uphold its precedent and remand this case for dismissal.

---

[10] *See, e.g.*, *Native Ecosystems Council v. Marten*, 800 F. App'x 543, 544 (9th Cir. 2020) (unpublished) ("We begin with [plaintiff's] claim that Appellees' decision to use ecosystem management as an analytical framework violates NFMA and NEPA. NEC's claim 'seek[s] wholesale improvement' of an internal decision-making process" and is not subject to APA challenge.); *Zixiang Li v. Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013) ("We have no authority to compel agency action merely because the agency is not doing something we may think it should do."); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in [*Lujan, supra*].");  *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009) ("Systemic improvement and sweeping actions are for the other branches, not for the courts under the APA."); *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 491-92 (5th Cir. 2014) (rejecting "blanket challenge to all of the Government's actions with respect to all permits and leases granted for natural resource extraction on a significantly large amount of land" because the "challenge is to the way the Government administers these programs and not to a particular and identifiable action taken by the Government").

### III. Rescinding the Jewell Order Was Not a Major Federal Action that Triggered NEPA.

NEPA ensures that agency decisionmaking will be informed by "detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To that end, it requires federal agencies to prepare a detailed EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). But "[a]n EIS is not necessary" when a federal program's status quo does not change. *Glickman*, 136 F.3d at 668.

NEPA only requires a federal agency to prepare a detailed EIS for agency actions that are (1) "federal," (2) "major," and (3) "have a significant environmental impact." *Id.*; *see also* 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1508.18 (defining "major [f]ederal action"). But the Zinke Order did not finance, assist, conduct, regulate, or approve anything, *id.* § 1508.18(a), nor did it adopt or propose "official policy, such as rules [or] regulations," "formal plans," "programs," or "special projects," *id.* §§ 1508.18(b)(1)-(4). Instead, it *only* ended a discretionary PEIS, along

47

with an associated temporary leasing pause, and resumed processing of applications submitted under existing regulations.

The crux of Plaintiffs' arguments is that Interior's existing federal coal leasing program is "outdated," so it must be reevaluated and updated. 1-ER-49. Plaintiffs also argued that the Zinke Order was a major federal action that triggered NEPA because the Jewell Order's pause "protected public lands" and the Zinke Order "lifted those protections without any environmental review." *Id.* The district court in effect accepted the first argument, *compare* 1-ER-53, -56 (no authority to order a PEIS), *with* 1-ER-52 (finding Zinke Order caused harm by ceasing evaluation of "concerns over outdated information within the coal-leasing program"), and it endorsed the second, *see* 1-ER-48. The district court thereby found that the Zinke Order somehow both ended a NEPA review and simultaneously created a need for a NEPA review—a finding that is facially nonsensical and inconsistent with established law.

Two decisions chart the proper course for this Court to reverse. In the first case, other plaintiffs sued to compel Interior to supplement the 1979 PEIS covering the federal coal leasing program. *WORC*, 892 F.3d at 1236. The plaintiffs argued that a supplemental EIS was necessary

because scientific evidence of climate change had developed significantly since 1979. *Id.* at 1236-37. But the district court granted Interior's motion to dismiss, finding no remaining or ongoing major federal action creating a duty to supplement the 1979 EIS. *Id.* The D.C. Circuit unanimously affirmed, finding that the plaintiffs "failed to identify any specific pending action, apart from the Program's continued existence, that qualifies as a 'major Federal action' under NEPA." *Id.* at 1243. Thus, it concluded that it "lack[ed the] authority to compel the Secretary to do so." *Id.* at 1237.

So too here. Because there is no independent obligation to periodically revisit Interior's coal leasing program, and no current Interior proposal to do so, there is no legal trigger obligating Interior to supplement the prior PEIS. *Id.* at 1237, 1243. *WORC* also held that Interior's "prior statements" or "own documents" suggesting future supplementation did not "create a legal duty" to update a prior PEIS. *Id.* at 1245–46. And the district court failed to identify any case—*anywhere, ever*—requiring supplementation of a programmatic NEPA review, especially without a proposed regulation. If there were such a freestanding, amorphous obligation to update a PEIS whenever new

information comes to light, "NEPA simply becomes a tool to stall new projects indefinitely." *Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006); *see also Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989) (an ongoing duty to supplement "would render agency decisionmaking intractable").

The district court strained to distinguish *WORC* on the basis that the Zinke Order (which it claimed "changed the status quo") was the major federal action missing in *WORC*. 1-ER-45. But that distinction fails. At the outset, the district court incorrectly claimed that the D.C. Circuit "limited its review … to the issue of whether [Interior] possessed a duty to update the PEIS due to its reliance on outdated information." 1-ER-44. The D.C. Circuit held the *WORC* litigation in abeyance during the pendency of the Jewell Order, and rescinded that order and set a briefing schedule after the Zinke Order. *WORC*, 892 F.3d at 1240. So the panel was undoubtedly aware of both Secretarial Orders when it concluded that there was *no* major federal action triggering NEPA review. *E.g.*, *id.* at 1241.

The district court faltered again when it claimed that "[t]he Zinke Order changed the status quo." Neither the Zinke Order, nor the Jewell

50

Order it rescinded, were ever judicially enforceable. *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982) (enforceable agency action must "prescribe substantive rules" and "conform to certain procedural requirements") (internal citation omitted); *see also Lowry v. Barnhart*, 329 F.3d 1019, 1022 (9th Cir. 2003) (same). Because neither the Jewell Order nor the Zinke Order ever altered the existing legal and regulatory landscape of the federal coal leasing program, they did not alter the relevant status quo. Thus, the Zinke Order *did not* "provide[] the agency action that proved missing from *WORC*." *See* 1-ER-45.

The district court instead relied on this Court's decision in *Lockyer, supra*, to find that the Zinke Order was a major federal action triggering NEPA. 1-ER-45—48. But *Lockyer* is inapposite. There, environmental groups challenged the repeal of the so-called "Roadless Rule," a programmatic approach to roadless area management, and its replacement with the "State Petitions Rule." *See* 575 F.3d at 1006-07. But the Roadless Rule was adopted from a Final EIS issued in November 2000, it was promulgated pursuant to administrative rulemaking procedures, and it ultimately went into effect in early 2003. *Id.* So the

repeal of that rule, short-lived as it was (seven months), *see id.* at 1014, actually altered the legal and regulatory landscape. The Jewell Order, however, was not a legally enforceable rule, and neither was the Zinke Order rescinding it. Rather than analyze the antecedent question whether an agency rule and a secretarial order trigger the same NEPA obligations (they do not), the district court seized on the fact that Interior failed to perform the same "level of environmental analysis performed in *Lockyer*," 1-ER-48, which was irrelevant.

In the second instructive case, environmental groups challenged the U.S. Forest Service's failure to prepare an EIS before the adoption and implementation of a regional management plan to address the spread of a tree root fungus. *Glickman*, 136 F.3d at 662-63. The plan employed an integrated approach to addressing the fungus, including inventory and monitoring, research and administrative study, public involvement and education, and management. *Id.* at 663. But the plan did not "create activities which impact the physical environment." *Id.* at 670. The court rejected the plaintiffs' claim that the management plan triggered NEPA obligations because the plan did not "propose any site-

52

specific activity [or] call for specific actions directly impacting the physical environment." *Id.*

By contrast, here the district court concluded that once an agency decides to study an issue in a discretionary PEIS, it has a legal obligation to complete the PEIS. But that is not the law. *Env't Health Trust v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 914 (D.C. Cir. 2021) ("the mere contemplation of certain action is not sufficient to require an impact statement" because the study of an issue "do[es] not necessarily result in a proposal for major federal action") (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 404, 406 (1976)); *see also CBD*, 260 F. Supp. 3d at 24 (another Interior agency not required to finish a review of its NEPA regulations). Unsurprisingly, the district court failed to cite any authority otherwise.

The Jewell Order provided for a "comprehensive review of the Federal coal program," but it did not "propose *any regulatory action*." 3-ER-541, -544 (emphasis added). After reviewing the results of that study—the scoping report and other information—Interior determined that it was unnecessary to complete the PEIS to continue or consider changes to its federal coal leasing regulations. Like the management plan in *Glickman*, the Zinke Order is not a "major federal action" because

53

it does not propose or implement *any* agency action.  *See Glickman*, 136 F.3d at 670.  Accordingly, this Court need not even reach the sufficiency of the Zinke Order's EA and FONSI to reverse, because NEPA does not apply to the Zinke Order in the first instance.

## IV.  Interior's NEPA Review Was Not Arbitrary and Capricious.

The district court criticized Interior's NEPA analysis for failing to take a "hard look" at the impacts of "re-starting the coal leasing program," to consider "a baseline of an indefinite moratorium," and to evaluate "the full scope of the Zinke Order's effect on all then-pending lease applications, and other connected, cumulative, or similar actions." *See* 1-ER-18, -22.  But those criticisms—rebuking Interior for not completing a programmatic NEPA review that it was never required to complete—fall flat.  Rather, Interior's NEPA analysis was appropriately tailored to the Zinke Order.  NEPA requires nothing more than what Interior prepared.

### A.  The scope of Interior's EA complied with NEPA.

To determine whether the scope of an EA is impermissibly narrow, courts apply a "reasonableness standard."  *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010); *see also Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 867-68 (9th Cir. 2004).

When assessing reasonableness, courts must consider the statutory context of the proposed action and relevant congressional directives. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.,* 689 F.3d 1060, 1070 (9th Cir. 2012) (statutory context relevant to reasonableness of statement of purpose and need); *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013) ("[A]n agency must consider the statutory context of the proposed action and any other congressional directives….").

Because the reasonableness of an agency's chosen alternatives "depends on the underlying purpose [of the proposed action]," courts should begin this analysis by evaluating the reasonableness of the agency's statement of purpose and need. *See Wild Wilderness v. Allen*, 871 F.3d 719, 728-29 (9th Cir. 2017). And an agency enjoys "considerable discretion" when defining the purpose and need. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998); *see also Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 148 F. Supp. 2d 1107, 1117 (E.D. Wash. 2001) ("This court is not aware of any case in which the Ninth Circuit found a statement of purpose to be unreasonably narrow."); *see Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800, 812-13 (9th

Cir. 1999) (finding the agency's purpose reasonable even though it ruled out alternatives that did not resemble the preexisting plan).

The district court found that Interior's range of alternatives was unreasonable, but it did not consider whether Interior's articulated purpose and need was reasonable. And the district court held that Interior's failure to consider "the effect of restarting coal leasing from a forward-looking perspective, including connected actions"—i.e., all future coal leasing decisions—violated NEPA. 1-ER-18—19. But Interior reasonably defined the purpose and need for the EA analyzing the Zinke Order's effects, and it set a reasonable baseline for analysis. Because the existing or any potential future federal coal leasing program is not a connected, cumulative, or similar action with the Zinke Order, Interior was not required to evaluate all current and future leasing decisions.

### 1. Interior reasonably defined the purpose and need for the EA.

Interior prepared the EA to respond to the district court's April 19, 2019 Order that the Zinke Order itself triggered NEPA review. 3-ER-342. The Zinke Order is the proposed action. 3-ER-385. It was issued in part to implement EO 13783, which directed Secretary Zinke to take "all steps necessary and appropriate" to amend or withdraw the Jewell

56

Order, 3-ER-509. It also was necessary because the PEIS was not a precondition to considering potential policy changes, the MLA did not provide the Secretary with authority to implement a longstanding or indefinite pause on federal coal leasing, and Congress effectively cancelled the PEIS when it denied funding for its completion. *See* 3-ER-335—36, -342.

Interior's statement of purpose and need was reasonable. First, it defined the need for the project based on its statutory obligation to make federal coal deposits "subject to disposition." 3-ER-335; *see also HonoluluTraffic.com v. Fed. Transit Admin.,* 742 F.3d 1222, 1230 (9th Cir. 2014) ("The [EIS's] stated objectives comply with the intent of the relevant federal statutes."). Interior's proposed action was not unreasonably narrow because it explained that the need to offer federal coal for leasing comes directly from pertinent statutory authorities. *See League of Wilderness Defs.*, 689 F.3d at 1070.

Second, Interior's purpose for the Zinke Order responded to EO 13783, which required federal agencies to advance domestic energy security. 3-ER-503—04. Agency actions implementing the objectives of executive orders are reasonable. *See, e.g., Colo. River Indian Tribes v.*

*Dep't of Interior*, No. 14-cv-02504 JAK (SPx), 2015 WL 12661945, at \*22 (C.D. Cal. June 11, 2015) (unpublished).

Third, Interior explained that the proposed action was also needed because Congress canceled funding for the Jewell Order's PEIS. *See* 3-ER-342. Given the considerable deference provided to agencies to define the purpose and need for an EA, Interior's statement of purpose and need were reasonable because it was informed by a congressional directive. *See, e.g., Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1088-90 (D. Mont. 2017) (agency's purpose in an EA, which relied on congressional policy, did not violate NEPA).

But the district court erroneously believed that Interior's NEPA analysis needed to consider "the effect of restarting coal leasing from a forward-looking perspective"—*i.e.*, consider the impact of all future and hypothetical coal leasing decisions. 1-ER-18. Agencies have no obligation to do the impossible. When defining the scope of an EA, agencies cannot consider every possible future consequence; they must draw the line somewhere. *See, e.g., WildWest Institute v. Bull*, 547 F.3d 1162, 1173 (9th Cir. 2008) (citation omitted) ("Agencies have 'discretion to determine the physical scope used for measuring environmental

58

impacts' so long as they do not act arbitrarily and their 'choice of analysis scale … represent[s] a reasoned decision.'"). Interior explained "[t]he limited scope of the leasing pause reduced the potential impact of its rescission, and by extension, any potential impacts of the Zinke Order," so it reasonably concluded that the impact of future leasing "does not relate to the purpose and need or inform a question of significance." 3-ER-337, -345. That is all that NEPA or the APA can require.

### 2. Interior's baseline for the EA was reasonable.

An agency's baseline conditions "must be based on accurate information and defensible reasoning." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016). The administrative record confirms that Interior's baseline relied on an accurate understanding of the status quo under the Jewell Order and was supported by defensible reasoning. But the district court concluded that Interior erroneously assumed the leasing pause would conclude when the PEIS was completed, *see* 1-ER-19, so it needed to consider a baseline of an "indefinite moratorium," *see* 1-ER-18.

The administrative record flatly contradicts the district court's purported "baseline" assumption. Interior's January 2017 scoping report

59

for the PEIS explained that the leasing pause would continue "until the completion of the PEIS," which it anticipated would "take approximately three years to complete." 3-ER-528. Thus, Interior's baseline in the EA was reasonably tied to Secretary Jewell's estimated timeframe for completing the PEIS. *See* 3-ER-347.

The Jewell Order described the "pause" of coal leasing as designed to allow the PEIS recommendations to inform "future leasing decisions." 3-ER-542. Contrary to Plaintiffs' and the district court's version of the status quo, the use of the word "pause" in the Jewell Order clearly indicated that the question was *when*, not *if*, processing of deferred coal leasing applications would resume. And given the MLA's leasing mandate and Secretary Jewell's rationale for the "pause," Interior reasonably found that the pause would be lifted upon completion of the PEIS. *See* 3-ER-347; *see also* 3-ER-380.

The EA explained that its three-year PEIS timeline was the best available information. 3-ER-347; *see also* 3-ER-381]. The Jewell Order initiated a temporary leasing pause with exemptions, not an indefinite moratorium on all coal leasing activities, so it had to anticipate the pause would end at some point. 3-ER-381—82. Rather than blindly

speculating, Interior opted to use the timeline supported by the record, which was reasonable.

Furthermore, Interior explained in the EA that any baseline that ended all federal coal leasing in perpetuity was plainly inconsistent with its statutory obligations. *See* 3-ER-347; *see also* 3-ER-386. Because the MLA promotes development of federal coal, Interior explained that "the Jewell Order was never intended to establish an indefinite pause on all coal leasing activities; rather it contemplated a limited pause on some leasing activities for the explicit purpose of facilitating preparation of the PEIS." 3-ER-335. That is, under the Jewell Order, the pause was merely a means to the voluntary NEPA review's end. The district court was not free to substitute a different, permanent no-leasing baseline preferred by Plaintiffs.

### 3. The federal coal leasing program is not a connected, cumulative, or similar action with the Zinke Order.

The district court found that Interior's NEPA analysis fell short because it failed to consider "the full scope of the Zinke Order's effect on all then-pending lease applications, and other connected, cumulative, or similar actions." 1-ER-22 (citing 40 C.F.R. § 1508.25); *see also* 1-ER-20

61

(noting Interior's pending lease application covering roughly 1.8 billion tons of federal coal in 28 mines across 9 states). But the Jewell Order's PEIS was intended only to inform "future leasing decisions," not existing leases. 3-ER-542—43. Thus, even if the Zinke Order "restarted" the federal coal leasing program (it did not), Interior was not required to analyze hundreds of existing federal coal leases because any reforms stemming from the Jewell Order's PEIS would be prospective in nature. Even so, the four leases attributable to the Zinke Order were neither "connected," "cumulative," nor "similar" actions to the entire federal coal leasing program so as to require inclusion in a single NEPA document for the Zinke Order. *See* 40 C.F.R. §§ 1508.25(a)(1)–(3). Moreover, this conclusion does not result in evasion of NEPA review because each future leasing decision remains subject to NEPA review.

This Court "appl[ies] an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single [NEPA document]." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006). Actions are "connected" when they are "inextricably intertwined" such that neither would exist but for the other. *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060,

1068 (9th Cir. 1995) (describing "connected actions" as actions akin to "links in the same bit of chain," rather than "separate segments of chain," which are not "connected actions" under NEPA regulations).

The Zinke Order is not "inextricably intertwined" with how Interior will make future coal leasing decisions. 3-ER-385 (EA explanation that "the Zinke Order does not preclude [Interior] from reviewing, studying or making improvements to the federal coal leasing program in the future"). To be sure, Secretary Haaland subsequently initiated her own review of the federal coal leasing program. *See* 86 Fed. Reg. at 46,873.

Unknown future mining activities are generally not considered "connected action[s]" under 40 C.F.R. § 1508.25(a)(1). *See Chilkat Indian Village of Klukwan v. BLM*, 399 F. Supp. 3d 888, 919 (D. Alaska. 2019) (finding "that future [mining] development activities are not a 'connected action' under 40 [C.F.R.] § 1508.25(a)"). Because superseding the Jewell Order early has no bearing on future, yet to be proposed, federal coal leases, Interior's EA did not violate 40 C.F.R. § 1508.25(a)(1).

Concluding, as the district court did, that the Zinke Order's rescission of the Jewell Order warrants a programmatic NEPA review of the entire federal coal leasing program would yield agency paralysis. *See*

*Nw. Res. Info. Ctr*, 56 F.3d at 1069 ("[F]orc[ing] an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once…. risks further paralysis of agency decisionmaking."). Future federal coal leases will require NEPA analysis as their details are developed, but Plaintiffs and the district court failed to connect the challenged Zinke Order to the consideration of every future federal coal lease.

Cumulative actions are those that "when viewed *with other proposed actions* have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (emphasis added). This only requires Interior to consider proposed actions that are actively under consideration. *See* 40 C.F.R. § 1508.1; *see also Lands Council v. Powell*, 379 F.3d 738, 746 (9th Cir. 2004), *as amended* 395 F.3d 1019 (9th Cir. 2005) (agency only required to "analyze the cumulative effects of projects that it is already proposing"). Because no other leasing had been proposed, much less leasing with relevant cumulatively significant impacts, Interior had no obligation to consider all future leasing as a "cumulative" action.

Cumulative action circumstances are not present here. For example, when multiple timber sales formed part of a single timber

salvage project that was simultaneously announced, reasonably foreseeable, and located in the same watershed, this Court required the Forest Service to prepare a single EIS for those sales. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214-15 (9th Cir. 1998); *see also Churchill Cnty. v. Norton*, 276 F.3d 1060, 1078-79 (9th Cir. 2001). But here, the four lease sales reviewed by the EA are on separate timeframes from any future leasing decisions and are not otherwise part of a proposed agency action to lease lands for mining within a particular geographic area. *See* 3-ER-340, -349—50.

Thus, Interior's focusing the EA on the four leases tied to the Zinke Order was not arbitrary or capricious. It had no obligation to consider the impact of prospective, yet to be proposed, leasing that might occur in the same area or elsewhere at some indeterminate time. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305-06 (9th Cir. 2003).

Finally, "similar" actions are actions "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3). There is no factual basis suggesting the four federal coal

65

lease sales reviewed in the Zinke Order EA share common timing or geography with future leasing under the federal coal leasing program. Interior evaluated four federal coal leases issued between May 2018 and February 2019 under the Zinke Order. 3-ER-341—42 (reviewing lease application from Oklahoma and Utah and two lease modifications from Utah). But there is no indication in the record that these leases share common timing or geography with hypothetical future leases or, for that matter, with pending lease applications. This Court should uphold Interior's selection of coal leases for consideration in its EA. *See Earth Island*, 351 F.3d at 1306.

## B. Interior took a "hard look" at impacts of rescinding the Jewell Order.

When reviewing the adequacy of NEPA analysis, courts apply a "rule of reason." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 992-93 (9th Cir. 2004). NEPA does not require agencies "to do the impractical." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996); *see also Kleppe*, 427 U.S. at 414 ("practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements"). Rather, NEPA only requires that the agency take a "'hard look' at the environmental consequences of its

*proposed action.*"  *See Blue Mountains Biodiversity*, 161 F.3d at 1211 (emphasis added).

Here, Interior's proposed action was to rescind the Jewell Order 24 months early, 2-ER-322, which did not trigger an obligation to review the environmental impacts from hypothetical leases granted at some distant point in the future.  Interior provided a reasoned explanation of any salient environmental effects that the four federal leases attributable to the Zinke Order may have, including on greenhouse gas emissions, socioeconomic impacts, and water quality.  3-ER-351—70.  That was sufficient.

The district court, however, concluded that Interior failed to take the requisite "hard look" because it "improperly cabined its analysis" to the coal leases granted during Secretary Jewell's estimated PEIS timeline and "fail[ed] to consider a potential alternative that provided a baseline of an indefinite moratorium."  1-ER-18.  But as also discussed above, Interior was not required to assume, as a baseline, that the leasing pause would continue indefinitely, or to expand its analysis to consider all current and future lease applications.  *See, e.g.*, *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003) (NEPA imposes no

obligation to "analyze impacts for any particular length of time.");
*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998)
("[A]gencies need not consider potential effects that are highly
speculative or indefinite.").

Interior explained that its temporal scope was based on the timeline
that the Jewell Order set for completing the PEIS, *see* 2-ER-321, which
it selected because it believed an indefinite pause was "*inconsistent* with
existing law and regulation," *see* 2-ER-323. Because the proposed action
was the Zinke Order, Interior analyzed the approved leases tied to *that*
order. 2-ER-322—23; *see also Friends of the Wild Swan v. Weber*, 767
F.3d 936, 944 (9th Cir. 2014) (Because agencies "ha[ve] to draw a line
somewhere," courts need only consider whether the agency "offered a
reasonable justification for why it drew the line where it did."). Interior
considered the impacts attributable to the Zinke Order and "articulated
a rational connection between the facts and the choice made." *Forsgren*,
336 F.3d at 962. That was sufficient.

### C. Interior considered a reasonable range of alternatives for its proposed action.

Agencies conducting NEPA analysis must consider a reasonable
range of alternatives that meet the purpose and need for the proposed

action. *See* 40 C.F.R. § 1508.9(b); *City of Carmel-by-The-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) ("The stated goal of a project necessarily dictates the range of 'reasonable' alternatives…."). Interior considered two alternatives with distinct outcomes: resuming coal leasing following the completion of Secretary Jewell's discretionary PEIS, and immediately resuming coal leasing under the Zinke Order. 2-ER-322; 3-ER-347—49. NEPA imposes no numerical floor on alternatives the agency must consider beyond the proposed action and no-action alternative. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005).

Both statutory objectives and executive orders "serve as a guide" to determine the reasonableness of the range of alternatives the agency considers. *See, e.g.*, *Westlands*, 376 F.3d at 866; *City of Carmel*, 123 F.3d at 1166. Interior reasonably concluded that a "no leasing" alternative was not viable because a permanent leasing pause was beyond the scope of the Jewell and Zinke Orders, and was inconsistent with both its obligation under the MLA to make federal coal deposits subject to disposition and EO 13783's direction to take necessary measures to resume federal coal leasing. 3-ER-335; 2-ER-325; *see also Forelaws on*

*Bd. v. Johnson*, 743 F.2d 677, 685 (9th Cir. 1984) (whether an agency's action comports with its statutory duty is relevant to whether the agency evaluated a range of reasonable alternatives under NEPA). Interior was not required to consider alternatives unresponsive to the purpose and need of the proposed action. *See Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973).

The district court concluded that Interior's "no action" alternative violated NEPA because it "presumed that the results of the Zinke Order would have come to pass in either alternative." 1-ER-20 (citing *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037-38 (9th Cir. 2008)). But *Friends of Yosemite Valley* found that Interior relied on an invalidated management plan as its baseline. 520 F.3d at 1038. Here, on the other hand, Interior reasonably determined that the Jewell Order would have ended as planned. 3-ER-347. Interior's "no action" alternative properly considered what would happen if there were no Zinke Order. *See* 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (defining "no action" alternative in instances involving federal decisions on project proposals). Any idea that a pause would continue forever absent the Zinke Order is unsupported by the record.

Interior's baseline in the "no action" alternative relied on "accurate information and defensible reasoning."  *Or. Nat'l Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016).  Rather than rely on the "baseline of an indefinite moratorium" that the district court erroneously concluded was necessary, *see* 1-ER-18—19—a baseline that would in effect require re-creating a coal leasing program from scratch, like in 1979, despite no Interior proposal to do so—Interior avoided such blind speculation and relied on the timeline in the record.  That baseline was reasonable.  *See Nat. Res. Def. Council, Inc. v. Hodel*, 624 F. Supp. 1045, 1054 (D. Nev. 1985) (citing *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (NEPA does not require consideration of speculative or unlawful alternatives).

## V.  The Court's Remedy Enjoining Leasing Impermissibly Rewrote Rather than "Reinstated" the Jewell Order.

The district court's approximately one-page discussion of remedy underscores and exacerbates the errors in its jurisdictional and merits analyses, and provides separate grounds for reversal.  *See* 1-ER-22. There is a sharp disconnect between what the district court expressly purported to do and what it actually ordered.  Namely, the district court's effort to "reinstate" the Jewell Order's conditional pause, but not its voluntary PEIS which was the sole condition precedent for its pause,

71

amounts to rewriting the Jewell Order to fashion a novel injunction. And the district court did in fact require the Jewell Order's PEIS to end the district court's novel injunction. That result is a far cry from restoring the "status quo" that the district court claimed, as such a status quo in fact never existed prior to its orders now on appeal.

First, despite invoking general "vacatur" principles for "an unlawful agency decision," the district court nowhere explained how vacatur here results in a mandatory NEPA review and pause of federal coal leasing. As discussed above, the court could not again "vacate" the already administratively-vacated Zinke Order and its correspondingly obsolete NEPA analysis. Nor did the district court cite any prior case vacating a secretarial order or holding that doing so has the effect of reviving on its own a prior secretarial order. That is no small issue because secretarial orders do not have the legally binding effect of APA rulemakings. The district court also failed to disclose that it effectively also vacated the Haaland Order—which Plaintiffs never challenged here—as the Haaland and Jewell Orders cannot meaningfully coexist.

Second, even if vacating the Zinke Order would revive the Jewell Order, the only relief afforded thereby would be the Jewell Order's terms,

i.e., its *optional* PEIS and conditional pause *during that PEIS*. As the district court elsewhere recognized, "the Jewell Order concludes that the moratorium and all other parts of the Jewell Order were to 'remain in effect until [the Jewell Order's] provisions are amended, superseded, or revoked.'" 1-ER-19—20. That is *exactly* what the Zinke Order did to the entirety of the Jewell Order. Even if that revocation were somehow unlawful, the remedy could not be a different Jewell Order. In other words, the district court possesses no authority to pick and choose which parts of the Jewell Order to keep or discard as if it were the Interior Secretary.

But that is precisely what the district court did here, by divorcing the Jewell Order's voluntary conditional pause from its voluntary PEIS. Earlier, the district court recognized that pause's dependency on that PEIS. 1-ER-30 ("[T]he Jewell Order imposed a moratorium on new coal leasing until completion of the PEIS."). Then, inexplicably, the district court held both that "reinstating the PEIS is not a potential remedy in this litigation" and that the "[t]he coal leasing program moratorium established by the Jewell Order shall be reinstated until the completion of sufficient NEPA review analyzing revocation of the moratorium." 1-

ER-21, -24. Both cannot be true under the Jewell Order, even if the Jewell Order truly represented the "status quo." Nor can the district court bridge this divide by chiding that "NMA and State-Intervenors fail to comprehend that the leasing moratorium represents a distinct target of this litigation," which is both factually incorrect and legally impossible. 1-ER-21. A myopic focus on the pause does not change its dependence wholly on a voluntary PEIS process under the Jewell Order.

Third, the district court's remedy revised the PEIS and pause to be mandatory rather than "discretionary" as under the actual Jewell Order. The district court ordered that "the Court will require sufficient NEPA analysis before BLM resumes the Coal Leasing Program, without mandating the resumption of the PEIS ordered by Secretary Jewell. BLM must perform NEPA analysis that considers the full scope of the Zinke Order's effect on all then-pending lease applications, and other connected, cumulative, or similar actions." 1-ER-22. That disavowal is semantics. The district court failed to explain how its vaguely contemplated "sufficient NEPA analysis" differs in *any* respect from the Jewell Order PEIS. And as shown by its decision's very next sentence quoted above, and as discussed *supra*, the district court's found supposed

74

shortcomings in Interior's analysis point directly to such a PEIS.[11] The district court's vacatur of the Zinke Order because it did not complete the Jewell Order's discretionary PEIS, divorced from any regulatory proposal, is the functional equivalent of compelling a PEIS in the first instance—directly contravening this Court's summary judgment order, the Jewell Order, and the D.C. Circuit's holding in *WORC*. *See also CBD*, 260 F. Supp. 3d at 24 (rejecting "that an agency can convert a voluntary task into a mandatory one simply by embarking on it").

Finally, by requiring programmatic NEPA analysis "before BLM resumes" any federal coal leasing, the district court entered a prohibitory injunction without the requisite analysis. "Injunction" means "a writ or order requiring a person to refrain from a particular act." Black's Law Dictionary, 2nd Ed., https://thelawdictionary.org/injunction. Consistently, when examining its jurisdiction over "[i]nterlocutory orders of the district courts … granting, continuing, modifying, refusing or dissolving injunctions" under 28 U.S.C. § 1292(a)(1), this Court considers

---

[11] *See also* 1-ER-18 ("The EA did not take the 'hard look' NEPA requires with respect to restarting the federal coal leasing program."); *id.* ("BLM's NEPA analysis should have considered the effect of restarting coal leasing from a forward-looking perspective, including connected actions.").

if orders have the "'practical effect' of granting, denying, or modifying injunctive relief." *Plata v. Davis*, 329 F.3d 1101, 1106 (9th Cir. 2003).

Here, the district court plainly intended to prohibit Interior from exercising its core federal coal leasing function under applicable statutes and regulations. Accordingly, the district court erred in concluding that "the Court need not consider the factors for injunctive relief in imposing vacatur and remanding the NEPA analysis here." 1-ER-23; *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). Nor did it "follow … precedent here," as its citations all involved final agency actions such as rulemakings and permit decisions.[12]  1-ER-23—24. By contrast, the district court here fashioned a novel standalone injunction of federal coal

---

[12] The district court misconstrued *Monsanto*. The district court ignored the Supreme Court's first finding providing a pathway for alfalfa planting to continue pending NEPA review on remand, even where, unlike here, existing law did not provide for such activity. 561 U.S. at 165. And the cited second finding was conditional only. *Id.* at 165-66 ("*If* a less drastic remedy was sufficient to redress respondents' injury no recourse to the additional and extraordinary relief of an injunction was warranted"). Indeed, if vacatur would have decided that case, the Supreme Court would not have had to lay out its detailed injunction analysis. The main takeaway from *Monsanto* is "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Id.* at 165. But the district court here exercised no such restraint with its remedy, despite receiving multiple rounds of dedicated briefing on remedy and the impropriety of practically enjoining future coal leasing based on Plaintiffs' claims in this litigation.

leasing where the Jewell Order did not do so, existing law governs such leasing, and the Zinke Order alone did not approve any leases.

Plaintiffs are entitled to no NEPA programmatic challenge unless Interior proposes to amend "the Federal Coal Management Program." *See WORC*, 892 F.3d at 1245. And under no scenario are Plaintiffs entitled to a moratorium on federal coal leasing. At a minimum, this Court should reverse the remedy below.

## CONCLUSION

For the reasons above, this Court should reverse the district court's grants of summary judgment to Plaintiffs because (1) the district court lacks subject matter jurisdiction over Plaintiffs' claims, (2) the Zinke Order did not trigger NEPA, or (3) Interior satisfied NEPA. At a minimum, this Court should reverse the district court's prohibition of future federal coal leasing pending additional NEPA review.

DATED this 5th day of June, 2023.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

*Assistant Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
peter.torstensen@mt.gov

*Attorneys for Appellant*
*State of Montana*

*/s/ Travis Jordan*

TRAVIS JORDAN
*Senior Assistant Attorney General*
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7895
travis.jordan@wyo.gov

*Attorney for Appellant*
*State of Wyoming*

*/s/ James M. Auslander*

Peter J. Schaumberg
James M. Auslander
BEVERIDGE & DIAMOND, P.C.
1900 N St., N.W., Suite 100
Washington, DC 20036
Phone: (202) 789-6009
pschaumberg@bdlaw.com
jauslander@bdlaw.com

*Attorneys for Appellant*
*National Mining Association*